Daryl GRATE, Petitioner,

v.

James STINSON, Superintendent, Great Meadow Correctional Facility, Respondent.

No. CIV.A. 97–2236–JS.

United States District Court, E.D. New York.

Sept. 30, 2002.

Darryl Grate, Auburn Correctional Facility, Auburn, NY, pro se.

*MEMORANDUM AND ORDER*

WILLIAM G. YOUNG, District Judge.[1]

## I.  INTRODUCTION

Daryl Grate ("Grate") petitions this Court for a writ of habeas corpus pursuant

---

**1.** Of the District of Massachusetts, sitting by    designation.

to 28 U.S.C. § 2254 ("section 2254"). He asks this Court to overturn his conviction for second degree murder and first degree robbery after a trial by jury in Nassau County Court in 1985. He advances four reasons why his conviction should be vacated: (1) The confession he gave to police on July 30, 1984 was involuntary, in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution, Pet. ¶ 12(A) [Docket No. 1]; (2) The admission at trial of a statement made by a codefendant violated his rights under the Confrontation Clause of the Sixth Amendment, *id.* ¶ 12(B); (3) His appellate counsel was ineffective for failing properly to frame the Confrontation Clause issue, which caused the Second Department of the New York Supreme Court, Appellate Division (the "Second Department") perfunctorily to dismiss Grate's claim with respect to this issue on direct appeal, *id.* ¶ 12(C); and (4) His appellate counsel was ineffective for failing to argue before the Second Department that the prosecution exercised peremptory challenges against prospective jurors on the basis of race, in violation of *Batson v.*

*Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *see* Memorandum & Order at 10 and n. 2, *Grate v. Stinson,* 97–CV–2236(JS) (E.D.N.Y. May 5, 2000) (Seybert, J.) ("Seybert Mem.") [Docket No. 30] (allowing Grate to amend petition to include *Batson* claim).

The government countered with a motion to dismiss on the ground that Grate's petition was not timely under the one-year limitations period established for section 2254 petitions, 2244(d)(1). *See* Docket Nos. 23, 24. The Court denied the motion on grounds that Grate had filed his initial petition within the one-year grace period after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established in this Circuit by *Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998),[2] and that the time Grate's petition spent in federal court under consideration did not count for purposes of calculating whether his 2254 petition was timely under 28 U.S.C. § 2244(d)(2), *see* Seybert Mem. at 5, 7 (citing *Walker v. Artuz,* 208 F.3d 357 (2d Cir.2000), *rev'd sub nom. Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)).[3]

**2.** *Ross* held that prisoners whose convictions became "final" before April 24, 1996—the date that AEDPA, which instituted the one-year limitations period for section 2254 petitions, became effective—have a one-year grace period in which to file a section 2254 petition. That is, so long as such prisoners file their petitions on or before April 24, 1997, their petitions are not time-barred. *Ross,* 150 F.3d at 103. Grate's conviction became final, at the latest, on March 19, 1990, when the Second Department denied his request for leave to appeal further to the New York Court of Appeals, Schwarz Aff. in Opp'n to Pet. ¶ 11 ("Schwarz Aff."). Grate is thus entitled to the benefit of the one-year grace period established by *Ross.* Judge Seybert ruled that Grate's petition was filed on April 21, 1997, the date on which Grate signed the petition and presumably handed it to prison officials to be mailed to the Court, Seybert Mem. at 6,

three days before the end of the grace period established by *Ross.*

**3.** This last proposition of law, although unquestionably correct at the time Judge Seybert issued her Memorandum and Order, is no longer correct, as the Supreme Court held in *Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001), that time during which a habeas petition sits in federal court awaiting resolution does *not* toll the limitations period for section 2254 petitions; only time spent pursuing "post-conviction or other collateral review" in *state* court so tolls the limitations period. *Id.* at 181–82, 121 S.Ct. 2120.

Does this mean that Judge Seybert was wrong to let Grate's petition get beyond the statute-of-limitations hurdle? Certainly not then, and, in this Court's view, not now. There are two reasons why this is so. First, the Second Circuit has observed that the limi-

The government responded with an Affidavit and Memorandum of Law in Opposition to Grate's Petition. Having received the government's opposition papers, the Court is now prepared to consider Grate's arguments on the merits.

## II. DISCUSSION

### A. Grate's Voluntariness Claim

Grate's first argument in support of his petition is that the confession he gave to police on July 30, 1984 was involuntary and the product of excessive police coercion, and thus taken by the police in violation of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment. Pet. ¶ 12(A). In that statement, which was written down by the police, read to Grate after he appeared to have difficulty reading it himself, and signed by him, Resp't's Opp'n Ex. 3 (Government's brief on direct appeal to the Second Department) at 8, 12, Grate admitted to shooting the victim in the case, Arthur Licurse ("Licurse"), accidentally during the course of robbing General Oil Distributors in East Rockaway, New York, along with an accomplice, Charles Clink ("Clink"). *See generally id.* at 13–17 (reprinted version of Grate's statement); *id.* Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department), at Ex. B (original version of Grate's statement, handwritten by the police).

The government responds to this argument by stating that Grate never raised this argument at trial, and thus cannot be allowed to raise this claim on collateral

---

tations period for section 2254 petitions set out in 28 U.S.C. § 2244(d)(1) is a statute of limitations, rather than a jurisdictional bar to suit. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000). This is significant for a number of reasons, one of which is that a statute of limitations is an affirmative defense that may be waived. *E.g., Kropelnicki v. Siegel,* 290 F.3d 118, 130 n. 7 (2d Cir.2002) (citing Fed. R.Civ.P. 8(c)). Although the government vigorously litigated the statute of limitations defense earlier in the lawsuit, it has acquiesced in the ruling of Judge Seybert on the statute of limitations issue by filing an opposition to Grate's petition on the merits on June 5, 2002—almost one year after the decision by the Supreme Court in *Duncan.* This Court therefore considers the respondent to have waived any objection to Grate's petition on statute-of-limitations grounds.

Second and more important, however, is that Judge Seybert's ruling, though relying on a since-reversed Second Circuit decision, *Walker v. Artuz,* 208 F.3d 357 (2d Cir.2000), recognized the inequity that would result from failing to consider a petition like Grate's on the merits. Seybert Mem. at 8–10. In response to the Supreme Court's decision in *Duncan,* the Second Circuit echoed this concern, ruling in *Zarvela v. Artuz,* 254 F.3d 374 (2d Cir.2001), that district courts confronted with "mixed petitions"—petitions presenting unexhausted along with exhausted claims—

such as the one presented by Grate (because of his unexhausted ineffective assistance/*Batson* claim) should usually stay, rather than dismiss, the exhausted portion of the petition to allow the petitioner a reasonable period of time (typically 30 days) to return to state court to exhaust the previously-unexhausted claims. *Id.* at 380–82. Had *Duncan* and *Zarvela* been extant at the time Grate realized that he had an unexhausted claim, he no doubt would have asked for a stay, rather than an outright dismissal, *see* Docket No. 16 (Letter from Grate to Judge Seybert requesting dismissal), of his habeas petition pending exhaustion of his ineffective assistance-*Batson* claim in state court. Instead, Grate got caught in the middle of a legal regime change with respect to the rules governing the time limits for 2254 petitions that made it difficult, if not impossible, to perfect his mixed petition in a timely manner. Such a regime change ought not prevent him from having his petition heard on the merits. *See Zarvela,* 254 F.3d at 383 ("Under the circumstances, especially as the implementation of AEDPA's limitation requirements is being developed, we do not think this *pro se* litigant should lose his opportunity to present his constitutional challenge to his conviction because he requested the wrong form of procedural relief."). This Court follows *Zarvela*'s reasoning.

review in federal court. In the government's view, the sentence in the decision of the Second Department rejecting Grate's voluntariness claim on direct appeal—"We have examined the defendant's remaining contentions, including those raised in this supplemental pro se brief, and find them to [be] either unpreserved for appellate review or without merit," *People v. Grate,* 155 A.D.2d 553, 554, 547 N.Y.S.2d 584 (2d Dep't 1989)—constitutes an independent and adequate state ground for the Second Department's rejection of Grate's Fifth Amendment claim, and thus bars a federal court from entertaining the claim.

■ It is generally true, as the government suggests, that when a defendant fails to raise a federal constitutional issue at trial, and is told by an appellate court that the issue will not be considered on appeal because the defendant failed to raise it below, the decision of the state appellate court constitutes an independent and adequate state law ground for rejecting the defendant's federal claim that bars a federal court from considering the issue on collateral review. *Coleman v. Thompson,* 501 U.S. 722, 729–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). It is also generally true that, when an appellate court affirms without explanation an argument by the government that a defendant's claim is both unpreserved for appellate review and meritless, the appellate court's decision

should be presumed to rest on state procedural grounds. *E.g., Epps v. Comm'r of Corr. Servs.,* 13 F.3d 615, 618 (2d Cir. 1994).

■ These rules have no application here, however, because Grate did in fact raise the issue of the voluntariness of his confession several times—at a suppression hearing, Suppression Hr'g Tr. at 557–86, at a pre-trial hearing, Pre–Trial Hr'g Tr. at 42–44, at trial, Trial Tr. at 461–69, 479–90, and on direct appeal, Resp't's Opp'n Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department), at 37–40; *id.* Ex. 2 (Grate's pro se supplemental brief), at 16–21. The trial judge wrote an opinion deciding matters raised at the suppression hearing that addressed, among other things, "the validity of the statement[ ] taken from the defendant[ ]." *Id.* Ex. 3 (Government's brief on direct appeal to the Second Department), at Ex. 1, p. 1 (Findings of fact and conclusions of law by the trial court on Grate's motion to suppress). The trial court ultimately concluded that Grate's statement was admissible at trial. *Id.* at p. 6. This suffices, in this Court's view, to establish that Grate did make an issue of the voluntariness of his confession at trial, even if, as the government suggests, Grate did not object to the admission of Grate's statement at the trial itself, Resp't's Opp'n at 13.[4] He has not

---

4. The government is incorrect as matter of law that a defendant need object to the voluntariness of a confession at a suppression hearing *and* at trial. The government cites section 470.05(2) of the New York Criminal Procedure law for the proposition that Grate's failure to object to admission of his confession *at trial* imposed a procedural bar to appellate review of the issue. Resp't's Opp'n at 13. This Court does not read that provision to require a defendant to object to the admission of an allegedly coerced confession at trial, at least where the defendant has challenged the admissibility of the statement at a suppression hearing and lost. The provision requires only

that the party claiming reversible trial error on appeal register such objection with the trial court "during a trial *or proceeding,*" N.Y.Crim. Proc. Law § 470.05(2) (emphasis added). The New York Court of Appeals has observed that this section requires that "any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon,* 85 N.Y.2d 71, 78, 623 N.Y.S.2d 735, 647 N.E.2d 1243 (1995). Grate gave the trial court an oppor-

defaulted on this claim, and the Court will proceed to consider it.

That this Court will proceed to the merits of Grate's Fifth Amendment voluntariness claim does not mean, however, that the Court will make its own independent determination of whether Grate voluntarily confessed to the police. Prior to the enactment of AEDPA, the Supreme Court held with respect to the voluntariness of a confession that a federal court investigating the issue on habeas was empowered to opine *de novo* on the ultimate legal question of the voluntariness of a confession, even though it had to apply a "presumption of correctness" to state court findings of predicate facts, such as whether the police engaged in intimidation tactics. *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

The landscape has changed since enactment of AEDPA, however. What remains the same is that a federal court conducting a collateral review must still presume state court findings of fact to be correct, 28 U.S.C. § 2254(e), although it is probably harder now for a habeas petitioner to overcome this presumption, as the petitioner must now present clear and convincing

evidence that the finding of fact was erroneous, *id.* But what has changed significantly in light of AEDPA is that a federal court exercising its habeas jurisdiction over a petitioner's federal claim that was adjudicated in state court "on the merits" may not disturb the state court judgment unless the decision "involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).[5] In both of the relevant provisions of section 2254(d), the key word is "unreasonable." The Supreme Court has held that the word unreasonable found in section 2254(b)(1) means something worse than merely "erroneous" or "incorrect." *Williams v. Taylor*, 529 U.S. 362, 410–11, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, it means that a state court must have applied extant Supreme Court case law or found facts based on the evidence presented to it in an objectively unreasonable manner before a federal court may overturn the state court's decision. *Id.* at 409, 120 S.Ct. 1495.[6]

tunity to avert reversible error before admitting his confession at trial by raising the issue at a suppression hearing. Having lost the issue at the suppression hearing, it was not necessary for Grate to revive his objection to the statement at trial in order to preserve the issue for appeal. As the United States Supreme Court noted with respect to this provision of the New York Criminal Procedure Law, "once a protest is made, it need not be repeated at each subsequent disposition of the matter." *County Court v. Allen*, 442 U.S. 140, 150 n. 8, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). Federal law is now the same. Fed. R.Evid. 103(a)(2).

**5.** A state conviction may also be overturned if a legal determination made by the state court was "contrary to ... clearly established Federal law, as determined by the Supreme Court

of the United States," 28 U.S.C. § 2254(d)(1). This provision is not at issue here, as the Court concludes that the state trial court applied the correct legal framework—the "totality of the circumstances" voluntariness standard from Supreme Court case law, *e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–27, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)—even if it did not identify that framework by name or citation.

**6.** The Supreme Court in *Williams* declined to state with greater precision when a decision by a state court involves an "unreasonable" application of Supreme Court case law, but expressed confidence that the word unreasonable "is a common term in the legal world" with which most federal judges are familiar and could apply easily. 529 U.S. at 410, 120 S.Ct. 1495. The Second Circuit has advanced

Prior to AEDPA, then, a federal court exercising its power to grant writs of habeas corpus could decide questions of law or mixed questions of law and fact—such as the voluntariness of a confession—*de novo*, even if it was required to presume that state court findings of fact were correct. After AEDPA, however, so long as the issue has been raised and decided in state court on the merits, it appears that, even with respect to mixed questions of law and fact, the federal court may overturn the decision of the state court only if the decision was objectively unreasonable. *Cf. Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir.2001) (applying deferential "unreasonable application" standard of section 2254(d)(1) to a claim of ineffective assistance of counsel claim, despite the fact that, prior to AEDPA, the effectiveness of counsel, like the voluntariness of a confession, was a mixed question of law and fact that a habeas court adjudicated *de novo*, *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). With this deferential standard in mind, the Court turns to Grate's voluntariness claim.

■ Grate was stopped by Detectives Robert Dempsey ("Detective Dempsey" or "Dempsey") and James Dempsey ("Detective James Dempsey") in the Bronx at around 1:30 p.m. on July 30, 1984. Suppression Hr'g Tr. at 280. Detective Dempsey identified Grate walking on the street based on a photograph of Grate from a prior arrest card that Detective Dempsey brought with him in the police cruiser after learning from Clink, Grate's accomplice in the crime, that Grate was

the trigger man in the robbery-turned-homicide. *Id.* at 280–81, 276. Detective Dempsey got out of his police cruiser, stopped Grate, placed him under arrest for murder, and placed him in the police cruiser. *Id.* at 281–82. At that time, Dempsey noticed that Grate had sutures sticking out of his ear. *Id.* at 565. He asked Grate what happened; Grate said that his jaw had been broken in a fight with "some Puerto Rican guy who hit him in the face or the jaw with a brick." *Id.* Grate also told Dempsey that his jaw was wired, *id.*, although this fact apparently did not prevent Grate from communicating effectively with the detectives. As the detectives were driving Grate from the Bronx to the Nassau County homicide squad headquarters in Mineola, and before Grate had been apprised of his *Miranda* safeguards, Detective Dempsey told Grate that "we knew the whole story, that we had arrested Charles Clink and Charles Clink told us that [Grate]'s the one who shot the dispatcher in the oil depot." *Id.* at 282. Grate said nothing in response, and no other conversation took place between the detectives and Grate. *Id.*

The detectives and Grate arrived at the homicide squad headquarters at around 2:45 pm. *Id.* Detective Dempsey seated Grate at a chair opposite a wooden desk in a vacant office, *id.* at 283,[7] and handcuffed him to the chair, *id.* at 573. Shortly thereafter, Dempsey apprised Grate of his constitutional rights. *Id.* at 283.[8] After mentioning each constitutional protection, Dempsey asked Grate if he understood it. *Id.* at 283, 568. Grate replied that he did.

---

the ball slightly in this respect, holding in *Francis S. v. Stone*, 221 F.3d 100 (2d Cir. 2000), that although "[s]ome increment of incorrectness beyond error is required ... the increment need not be great," lest habeas be limited to overturning state court decisions "so far off the mark as to suggest judicial incompetence," *id.* at 111 (citation omitted).

7. The Suppression Hearing Transcript is apparently misnumbered; there are two pages in a row numbered "283." This reference can be found on the first page numbered 283.

8. This reference can be found on both pages numbered "283."

*Id.* Dempsey then asked Grate if he was willing to talk about what happened without a lawyer or others present; Grate said yes. *Id.* at 283, 568–69.

Detective Dempsey then reiterated his earlier statement to Grate that "Charles Clink told us ... how this murder went down and [h]ow you took that gun, put it in that boy's back and you pulled the trigger after smiling." *Id.* at 283. At this point, Grate broke down and cried. He said "Let me tell my side of the story, man. I'm no murderer. You got to believe me. It was an accident." *Id.*[9]

Over the course of the next hour and a half to two hours, Grate orally gave his version of the events to Detective Dempsey, answering questions about what happened at the scene of the crime. *Id.* at 571–72, 284. Dempsey then asked Grate if he was willing to give a written statement recounting what he had just told Dempsey orally; Grate said yes. *Id.* at 284. At around 4:00 pm, Dempsey began taking down a written statement from Grate. *Id.* at 574. Dempsey would ask Grate a question, Grate would answer, and Dempsey would record the answer in the process of compiling a narrative of the events. *Id.* at 284. After Dempsey completed the statement, he handed it to Grate and asked Grate to read it. *Id.* at 285. After Grate informed Dempsey that he had difficulty reading, however, Dempsey asked Grate if Grate wanted Dempsey to read the statement out loud; Grate said yes. *Id.* Dempsey read the statement in its entirety to Grate and asked him if it was the truth; Grate said that it was. *Id.* Dempsey then asked Grate to sign the statement, and watched as Grate signed each page. *Id.* The written statement was completed at around 5:50 pm. *Id.* at 286.

During the interview, the police allowed Grate to use the restroom several times. *Id.* at 573. While Grate was at the homicide squad headquarters, but after he signed the written statement, he was allowed to make several phone calls. *Id.* at 287. After the interview, the police took Grate to dinner en route to a store in the Bronx where Grate said he had given away the murder weapon. *Id.* at 288–89. Throughout the interview, Grate made no complaints to Detective Dempsey regarding the conditions of his interrogation. *Id.* at 573.

Based on these facts adduced at the suppression hearing, the trial court concluded that Grate's statement was admissible. The trial judge made the following findings of fact:

> Grate was arrested on July 30, 1984 at 1:30 pm in the Bronx by Dempsey. Grate was brought back to Nassau County ....

> Grate was advised of his rights and told that Clink had talked. He started to cry and said it was an accident, that the gun went off accidently [sic]. The hammer had been cocked when he got the gun from Clink. He gave a statement that was written down in a narrative. When it was given to him to read he had difficulty so Dempsey read it to him. He then signed it as did Dempsey. It was completed at about 5:50 pm.

> While at headquarters [Grate] made two phone calls. One to [his girlfriend] Renee about 7 pm and another to his father in the bronx [sic].

Resp't's Opp'n Ex. 3 (Government's brief on direct appeal to the Second Department), at Ex. 1, p. 4 (Findings of fact by the trial court on Grate's motion to suppress). Because these findings of fact are not unreasonable in light of the record as

---

**9.** This reference can be found on the second page numbered "283."

reviewed by this Court, the Court will not disturb them under 28 U.S.C. § 2254(d)(2). Grate has done nothing to rebut the presumption of correctness with respect to these findings, *see id.* § 2254(e)(1), so the Court presumes them to be correct.

Other facts adduced at trial bear on the voluntariness inquiry. Thomas Darnowski ("Darnowski"), an administrator at a special education school that Grate attended until 1980, Trial Tr. at 726–27, 729, 733, testified about Grate's performance in school as well as his educational abilities. Darnowski testified that Grate had an IQ between the mid–70s and low–80s, *id.* at 732, which Darnowski characterized as "dull normal" and "borderline" mentally retarded, *id.* at 732. When Grate left school, he was performing at the second grade level in terms of reading ability. *Id.* at 733. Darnowski also indicated that Grate was possibly dyslexic. *Id.* With respect to Grate's statement written down by Detective Dempsey, Darnowski opined that "[t]he type of language used, the sentence structure, the grammar ..., the descriptive words used" were too complex to have been written by Grate. *Id.* at 764. Darnowski also presumed that Grate would have been unable to read it by himself. *Id.* Darnowski did admit on cross-examination, however, that Grate would be able to understand and respond to concrete questions. *Id.* at 767–68. He also acknowledged on cross-examination the report of a psychologist which indicated that Grate had "street knowledge," *id.* at 781, and a "potential intelligence [that] would seem to be higher than his tested IQ," *id.* at 782.

The important question for purposes of Grate's voluntariness claim is whether, assuming these facts to be true, the decision of the trial court to admit Grate's confession after the suppression hearing and at trial was a reasonable one in light of the clearly established law of voluntariness as announced by the Supreme Court. 28 U.S.C. § 2254(d)(1). Though not a Supreme Court case, the Second Circuit's decision in *Green v. Scully,* 850 F.2d 894 (2d Cir.1988), contains a useful summary of the voluntariness standard articulated by the Supreme Court:

> No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances. ...
>
> In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials. The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. The second circumstance, the conditions under which a suspect is questioned, includes the place where an interrogation is held, *Mincey [v. Arizona],* 437 U.S. 385, 398, 98 S.Ct. at 2416, 57 L.Ed.2d 290 [ (1978) ] ("It is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than [interrogation in a hospital's intensive care unit]."); *see also Bram [v. United States],* 168 U.S. [532,] 563, 18 S.Ct. at 194, 42 L.Ed. 568 [ (1897) ], and the length of detention, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047. The presence or absence of counsel is a significant condition because counsel can "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation

process." *Miranda* [*v. Arizona*], 384 U.S. [436,] 469, 86 S.Ct. at 1625[, 16 L.Ed.2d 694] [(1966)].

The final and most critical circumstance for purposes of this appeal is the law enforcement officers' conduct. Facts bearing on that conduct include the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; whether there was physical mistreatment such as beatings, *see Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, *see Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047; or even of clothing, *see Bram,* 168 U.S. at 561, 18 S.Ct. at 194 (suspect was taken to police detective's office and there "he was stripped of his clothing") for a prolonged period. In addition—as specifically raised in the instant case—such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

*Id.* at 901–02. (Second Circuit citations omitted).

Against this legal standard, it is clear that the decision of the trial court to admit Grate's confession was not unreasonable. To be sure, Grate was quite young at the time he was arrested (20 years old, *see* Resp't's Opp'n Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department), at Ex. B, p. 1 (original version of Grate's statement, handwritten by the police)). He also has a very low IQ, and his reading and writing abilities appear to be quite poor. He was characterized by one evaluator as having "street knowledge," Supp. Hr'g Tr. at 781, however, and he appeared to have had prior experience with the criminal justice system at the time of his arrest, as evidenced by the fact that Detective Dempsey was able to pull a photograph and arrest card of Grate from police records as a means to identify him on the street at the time of his arrest, *id.* at 280–81, 276.

Nothing about the conditions of the interrogation itself suggest that Grate's will was overborne. He apparently was handcuffed from the time he was arrested until the time Detective Dempsey completed the written statement. On at least one occasion during the interview, however, he was allowed to get up and go to the bathroom. Later, he was allowed to call a girlfriend and his father, and was taken to dinner. Importantly, at no time during the interview did Grate complain of the conditions of his interrogation. He did not take the witness stand, at the suppression hearing or at trial, to counter the version of events inside the interrogation room put forth by Detective Dempsey.

Finally and most importantly, no aspect of the police conduct during the interrogation suggests that Grate was coerced into giving a confession. There are no allegations that the police beat Grate, confronted him with trumped-up or false evidence, or made false offers of leniency to him in exchange for his confession. The only tactic they used was to confront Grate with an actual statement already given to the police by Clink suggesting that Grate killed Licurse deliberately. The police then read Grate his rights, asked if he wished to speak to them, and gave him an opportunity to respond to Clink's statement. What followed was Grate's version of the story.

Nothing in this litany of characteristics of the police interrogation of Grate suggests to this Court that the trial court's application of the Supreme Court's totality-of-the-circumstances standard to the

facts of this case was erroneous, much less unreasonable. The Court accordingly rejects Grate's first argument in support of his petition.

## B. Grate's Confrontation Clause Claim

Grate next argues that his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), were violated when a portion of a statement made by Clink that was inculpatory with respect to Grate was admitted into evidence at Grate's trial. Grate objected to the admission of Clink's statement at trial, Trial Tr. at 14–15, 301, 305, and raised the issue on appeal, Resp't's Opp'n Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department), at 25–36. The Second Department treated Grate's argument on this issue with greater care than it did any other issue raised by Grate on appeal, but ultimately rejected it:

> The defendant's argument that he was deprived of his Sixth and Fourteenth Amendment right of confrontation is premised on his erroneous belief that he and his codefendant were jointly tried and that the codefendant's confession was admitted into evidence. However, because the defendant was tried separately and only his own confession was admitted at his trial, his claim is patently without merit.

*Grate,* 155 A.D.2d at 554, 547 N.Y.S.2d 584. The government argues that these conclusions do not constitute an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), and therefore cannot be disturbed by this Court.

The government is correct with respect to the Second Department's conclusion that Grate was tried separately from Clink, as the parties do not dispute that Grate and Clink were ultimately tried separately. *See, e.g.,* Trial Tr. at 15, 18–19. A closer question is whether the Second Department's conclusion that "only [Grate's] own confession was admitted at his trial," 155 A.D.2d at 554, 547 N.Y.S.2d 584, is unreasonable in light of the evidence presented at trial. It certainly is erroneous. Although Clink's statement was not admitted at Grate's trial to the extent that Grate's attorney asserted on appeal—a fact the Court takes up in its consideration of whether Grate's appellate counsel was ineffective, *see infra* Part II.C—a small portion of Clink's statement was admitted at Grate's trial through the testimony of Detective Dempsey. During direct examination of Detective Dempsey concerning the circumstances of Grate's arrest, Dempsey testified as follows:

> Mr. Grate asked me what murder was he being arrested for and I told him that he was being arrested for the murder of the oil dispatcher in the oil depot in Inwood. I then said to Mr. Grate that I had a conversation and I spoke to Charles Clink and Clink told us that [Grate] shot the kid in the back.

Trial Tr. at 305. Detective Dempsey again testified to this portion of Clink's statement to Grate when he recounted his conversation with Grate at the homicide squad headquarters in Mineola. *Id.* at 309. Although Grate's appellate counsel did not refer the Second Department to these portions of the trial transcript, the government did, Resp't's Opp'n Ex. 3 (Government's brief on direct appeal to the Second Department), at 27 n.*. In light of the fact that the government apprised the Second Department of this portion of the trial record, the Second Department's conclu-

sion that "only [Grate's] own confession was admitted at his trial," 155 A.D.2d at 554, 547 N.Y.S.2d 584, was beyond erroneous to a sufficient degree that it amounts to an "unreasonable" determination of fact in light of the evidence presented at trial under section 2254(d)(2). *See Francis S.,* 221 F.3d at 111 (noting that although "[s]ome increment of incorrectness beyond error is required" in order for a state court application of law to fact under section 2254(d)(1) to be unreasonable, "the increment need not be great"). This Court therefore considers whether, in light of the fact that a small portion of Clink's statement was in fact admitted at Grate's trial, the decision of the Second Department rejecting Grate's Confrontation Clause claim represented an unreasonable application of then-extant[10] Supreme Court case law under 28 U.S.C. § 2254(d)(1).

The Second Department, in its brief decision rejecting Grate's Confrontation Clause claim, attached great significance to the fact that Grate was not, in fact, tried together with Clink, who also confessed to participating in the crime and who implicated Grate in his confession. This emphasis was likely because, in several Supreme Court decisions addressing the Confrontation Clause, the Court found error in the admission of statements of nontestifying codefendants who were tried jointly with the defendant. *Cruz v. New York,* 481 U.S. 186, 193–94, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) ("[W]here a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is in-

structed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." (citations omitted)); *Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that the Confrontation Clause is violated "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial"). But this type of error (which the Court labels *Bruton* error) is not the only species of Confrontation Clause error. In other words, the defendant need not have been tried jointly with a nontestifying codefendant in order for the specter of a Confrontation Clause violation to arise.

In *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), for example, the Supreme Court found a violation of the Confrontation Clause where the government introduced at Douglas's trial the statement of an accomplice, a man named Loyd, who was tried separately from and convicted prior to Douglas. *Id.* at 416, 419, 85 S.Ct. 1074. The government put Loyd on the stand and, when Loyd invoked his privilege against self-incrimination (as his conviction was on appeal), the government sought to refresh Loyd's recollection by reading portions of Loyd's confession that implicated Douglas as the man who fired the gun that injured the victim. *Id.* at 416–17 & n. 3, 85 S.Ct. 1074. The Supreme Court concluded that:

> [a]lthough the [prosecutor's] reading of the Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's]

10. In order for a Supreme Court decision to be part of the relevant case law that a state court is to apply under section 2254(d)(1), the decision must have been extant "as of the time of the relevant state-court decision."

*Williams,* 529 U.S. at 412, 120 S.Ct. 1495. Here, the relevant state court decision is that of the Second Department, which was issued on November 13, 1989. *Grate,* 155 A.D.2d at 553, 547 N.Y.S.2d 584.

reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true. *Id.* at 419, 85 S.Ct. 1074. Because Douglas could cross-examine neither the prosecutor nor Loyd, Douglas had no way to test the veracity of Loyd's statement that Douglas was the one who fired the gun. *Id.* The Court therefore reversed the judgment of conviction. *Id.* at 423, 85 S.Ct. 1074.

A more recent Supreme Court decision, *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), raised concerns similar to those expressed in *Douglas*—Confrontation Clause concerns distinct from those raised by *Bruton*-variety Confrontation Clause claims—even though *Lee* technically involved a joint trial of defendants. *Lee,* 476 U.S. at 542, 106 S.Ct. 2056 ("[T]his is not strictly speaking a *Bruton* case because we are not here concerned with the effectiveness of limiting instructions in preventing spill-over prejudice to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial. Rather, this case is strikingly similar to *Douglas.*"). In *Lee,* a codefendant's statement was admitted in evidence at a joint bench trial of Lee and the codefendant. *Id.* at 531, 106 S.Ct. 2056. Neither defendant testified. *Id.* at 536, 106 S.Ct. 2056. The codefendant's confession attributed to Lee a greater level of premeditation in the commission of more murders than did Lee's confession. *Id.* at 534–35, 106 S.Ct. 2056 Lee's confession suggested that Lee participated in only one murder, whereas the codefendant's statement suggested that she participated in two; Lee's statement also suggested that her participation in the one murder was merely the result of provocation by the victim, or even an exercise of self-defense against the victim, while the codefendant's statement suggested that Lee and the codefendant planned the murders of both victims in advance. *Id.* at 533–35, 106 S.Ct. 2056. The trial court relied in part on the codefendant's statement in finding Lee guilty of both murders. *Id.* at 538, 106 S.Ct. 2056. The Supreme Court ruled that the statement of the codefendant—an accomplice to the crime who confessed only after learning that Lee had confessed, and who had an incentive to downplay his role in the crimes while trumping up Lee's role in the crimes—lacked sufficient indicia of reliability to be admissible against Lee. *Id.* at 544–46, 106 S.Ct. 2056. Therefore, the admission against Lee of the codefendant's confession at the joint trial violated Lee's rights under the Confrontation Clause. *Id.* at 546, 106 S.Ct. 2056.

■ The Confrontation Clause issue presented by the introduction of a portion of Clink's statement through the testimony of Detective Dempsey is not a *Bruton*-variety claim. But the fact that Grate and Clink were tried separately did not, *ipso facto,* cure any Confrontation Clause problem, as the Second Department suggested. Nonetheless, the trial court took affirmative steps to ameliorate a potential Confrontation Clause problem in the case by instructing the jury that it could not consider any statement made by Clink to the police for its truth, but only for "the fact that it was said, and Grate's response to it." Trial Tr. at 1038. Because Clink's statement was not admitted for its truth, but only to shed light on the circumstances under which Grate made his own confession to the police, it is not hearsay. *Ohio v. Roberts,* 448 U.S. 56, 62 n. 4, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (defining hearsay as "testimony in court ... of a statement made out of court, the statement being offered as an assertion to show the

truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter" (citation omitted)). This fact distinguishes this case in a material respect from *Douglas* and *Lee,* in which the key question was whether the hearsay evidence was sufficiently reliable to be admissible as substantive evidence bearing on the guilt of the accused. *Lee,* 476 U.S. at 542, 106 S.Ct. 2056 ("Here, as in *Douglas,* the State sought to use hearsay evidence as substantive evidence against the accused."). In contrast to those cases, and in the parlance of Supreme Court Confrontation Clause cases, in this case Clink's statement was never part of the "body of evidence" that the jury could consider in assessing Grate's guilt. *See Cruz,* 481 U.S. at 190, 107 S.Ct. 1714. Therefore, the concern expressed in Confrontation Clause cases that such evidence be subjected to a test of its veracity through the rigors of cross-examination, *e.g., Lee,* 476 U.S. at 540–41, 106 S.Ct. 2056; *Roberts,* 448 U.S. at 63–64, 100 S.Ct. 2531, is not implicated in this case.

██ On this basis, the Court concludes that the Second Department correctly rejected Grate's Confrontation Clause claim. The decision of that court was neither "contrary to" nor an "unreasonable application" of the Supreme Court cases that had been decided at the time of Grate's appeal, and thus this Court will not disturb that decision under section 2254(d)(1). Moreover, even if the Second Department did run afoul of section 2254(d)(1) on this point, this Court is quite sure that any error was harmless. *Lainfiesta v. Artuz,* 253 F.3d 151, 158 (2d Cir.2001) ("When evaluating presumptively correct convictions on collateral habeas review, the harmless error inquiry for errors of a constitutional dimension is 'whether the error had substantial and injurious effect or in-

fluence in determining the jury's verdict.' ") (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). There were, as far as this Court can tell, only two passing references at trial to but a small portion of Clink's statement, Trial Tr. at 305, 309, in a lengthy trial involving numerous witnesses. The trial court blunted the force of these references by instructing the jury not to consider them for their truth. *Id.* at 1038. The government had powerful evidence of Grate's guilt in the form of his own confession, in which he admitted to committing the robbery and shooting Licurse during the commission of the robbery. *Id.* at 328–37. In short, the Court concludes that the references to Clink's statements at trial did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710. This Court accordingly rejects Grate's Confrontation Clause claim.

## C. Grate's Ineffective Assistance Claim—Confrontation Clause

Grate's third argument in support of his petition for a writ of habeas corpus is that his appellate counsel was ineffective with respect to his Confrontation Clause Claim. Pet. ¶ 12(C). Grate argues that the manner in which his appointed appellate counsel presented the Confrontation Clause argument—namely, in erroneously stating that the admission of Clink's statement occurred at a joint trial of Grate and Clink (Brief of Grate's attorney on direct appeal to the Second Department), at 32, 36—caused the Second Department to dismiss Grate's claim on this issue perfunctorily. *See* Grate's Mem. in Support of Mot. for Writ of Error *Coram Nobis* at 19–20 (dated May 14, 1998) ("Second *Coram Nobis* Mem."), attached as an Exhibit to Letter from Darryl Grate to the Honorable Joanna Seybert (dated July 12, 2000) ("Grate

Letter") [Docket No. 34]; Grate's Aff. in Support of Mot. for Writ of Error *Coram Nobis* ¶¶ 13–14 (dated Sept. 21, 1992) ("First *Coram Nobis* Aff."), attached as an Exhibit to Grate Letter. The government does not dispute that Grate exhausted this claim by filing a motion for writ of error *coram nobis* with the Second Department in 1992, which that court denied on December 29, 1992, Resp't's Opp'n Ex. 7. Instead, the government argues that the mistakes of Grate's appellate counsel in framing the Confrontation Clause issue did not amount to ineffective assistance of counsel. Resp't's Opp'n at 14–16.

The standard for determining whether a defendant received ineffective assistance of counsel is outlined in the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The test comprises two elements that the defendant must demonstrate in order to prevail on an ineffective assistance claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. 2052. A defendant is entitled to the effective assistance of counsel not only during trial, but also during the prosecution of a first appeal as of right, so long as the state—as does New York, N.Y.Crim. Proc. Law § 450.10—grants a first appeal as of right to the defendant. *Evitts v. Lucey*, 469 U.S. 387, 393–94, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). On habeas review, this Court's role is limited to determining whether the Second Department applied the *Strickland* test unreasonably in denying Grate's *coram nobis* motion. 28 U.S.C. § 2254(d)(1).

Grate's ineffective assistance of appellate counsel claim with respect to the Confrontation Clause issue is slightly different from the more common variety of such claims (such as Grate's ineffective assistance of counsel claim with respect to the *Batson* issue, *see infra* Part II.D.), in which a defendant argues that appellate counsel failed to raise a potentially meritorious issue, *e.g., Jones v. Barnes*, 463 U.S. 745, 747–48, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Sellan v. Kuhlman*, 261 F.3d 303, 307–08 (2d Cir.2001); *Mayo v. Henderson*, 13 F.3d 528, 531 (2d Cir.1994). Here, Grate's argument on this point appears to be that, had his appellate counsel properly framed the Confrontation Clause issue, he would have been entitled to relief on that issue. As this Court has just finished demonstrating, however, *see supra* Part II.B., Grate would not have been entitled to relief even had his Confrontation Clause claim been framed more effectively, i.e., as a *Douglas*-type claim rather than a *Bruton*-type claim. Thus, even if the performance of Grate's appellate counsel was deficient under *Strickland* because of counsel's failure to recognize that Grate was tried separately from Clink and that only a small fraction of Clink's statement (as opposed to the entire written statement) was admitted at Grate's trial, it is clear from the discussion above that Grate did not suffer prejudice from these mistakes, as his Confrontation Clause claim, no matter how presented, would not have entitled him to a new trial.

In light of Grate's inability to show prejudice with respect to his appellate counsel's handling of the Confrontation Clause issue, this Court concludes that the decision of the Second Department denying

Grate's motion for writ of error *coram nobis* was not an unreasonable application of the Supreme Court's *Strickland* test. Therefore, the Court will not disturb the judgment of the Second Department on this point.

### D. Grate's Ineffective Assistance Claim—*Batson*

■ The last arrow in Grate's quiver is that his appellate counsel was once again ineffective, this time for failing to argue that the government's exercise of peremptory challenges during jury selection was impermissibly based on race in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* the Supreme Court ruled that the exercise of peremptory challenges on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 89, 106 S.Ct. 1712. The Court also set forth a method for establishing a *prima facie* case of discrimination in the selection of the petit jury. *Id.* at 96–98, 106 S.Ct. 1712. The Second Circuit recently summarized the Supreme Court's *Batson* framework as follows:

> First, a trial court must decide whether the party challenging the peremptory strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race. Such a *prima facie* case may be established by, inter alia, showing a pattern of challenges against minority prospective jurors. Second, once a *prima facie* case is established, the trial court must require the non-moving party to proffer a race-neutral explanation for striking the potential juror. This second step in the *Batson* inquiry does not mandate an explanation that is persuasive or even plausible. Finally, when the non-moving party has proffered a race-neutral explanation, the trial court must determine

whether the moving party has carried his or her burden of proving that the strike had been motivated by purposeful discrimination.

*Overton v. Newton,* 295 F.3d 270, 276 (2d Cir.2002) (citations omitted). Although *Batson* had not been decided at the time of Grate's trial, while his appeal was pending the Supreme Court ruled in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) that *Batson* applied retroactively to cases pending on direct appellate review, *id.* at 316, 107 S.Ct. 708. Grate's appellate counsel therefore could have made a *Batson* claim on direct appeal. The question for this Court is whether counsel's failure to do so amounted to ineffective assistance of counsel. More precisely, the question is whether the Second Department's conclusion that it did not amount to ineffective assistance of counsel represented an unreasonable application of *Strickland.* In order to answer this question, it is necessary to examine the transcript of the jury selection proceedings at Grate's trial.

On December 2, 1985, jury selection began in Grate's trial. A venire of 100 prospective jurors was brought into the courtroom, sworn, and instructed by the trial judge on the nature of the case. Voir Dire Hr'g Tr. at 7–8, attached as an Exhibit to Grate Letter [Docket No. 34]. A panel of sixteen prospective jurors (the "First Panel") was seated in the jury box and examined by the judge, at which point two of the jurors were excused by the judge and replaced by two other prospective jurors. *Id.* at 14–15. The government examined the panel, after which one juror was excused (but not replaced), *id.* at 15. Grate's attorney then examined the panel, *id.,* after which the parties began exercising challenges for cause and peremptory chal-

lenges, *id.* at 21.[11] The government made no challenges for cause; Grate's attorney made one. *Id.* Both parties then each exercised five peremptory challenges. *Id.* The record reflects (although this is contrary to the numbers above) that three prospective jurors remained at this point, *id.* at 22; these jurors were sworn and impaneled as trial jurors, *id.* Grate made no objection to the government's exercise of peremptory challenges or to the makeup of the trial jury during voir dire of the First Panel, *see id.* at 21–22; the record is silent on the races of those prospective jurors who were challenged, as well as those three jurors who were impaneled.

The next panel of sixteen prospective jurors (the "Second Panel") was called and examined by the judge, after which eight prospective jurors were excused and replaced with seven other prospective jurors. *Id.* at 22. The government then examined the panel, after which one prospective juror was excused. *Id.* at 22–23. Grate's attorney conducted the next voir dire, after which one more prospective juror was excused, leaving thirteen prospective jurors in the panel. *Id.* at 23. The government exercised one challenge for cause, of a black woman, because the prospective juror's "sister was murdered." *Id.* at 25. Grate's attorney objected, in part because "she is one of the few black jurors we have," *id.* The Court allowed the challenge for cause. Grate's counsel exercised one challenge for cause, and then the trial court excused one more prospective juror, a black man, on the ground that the man "told me he realized that because of his shift, that he would lose money if he stayed on this jury," *id.* at 26. The government then exercised two peremptory challenges, which drew the defendant's first objection to the government's exercise of peremptory challenges. Grate's attorney lodged an objection to the fact that "the District Attorney exercised peremptory challenges with respect to the only remaining black juror." *Id.* Grate's attorney also brought up that, during two previous episodes of jury selection in this case (in both a mistrial was declared—the record is silent as to why), "the only two or three jurors that were black, that could possibly be selected out of all of the panels we had, they were excused by [the government] ... without stating any reason, and he is continuing that here." *Id.* at 27. Grate's attorney continued: "We only get two or three black people per panel, and he is systematically, apparently, dismissing each and every one of them peremptorily. With 20 peremptories, there is no way we can have a black person on this jury. And I think the record should be clear on that." *Id.* The trial court did nothing at this point except to note the objection. *Id.* After the objection, the government exercised one more peremptory challenge with respect to the Second Panel; Grate's attorney exercised one, leaving the panel with three prospective jurors, all of whom were sworn and impaneled, bringing the total number of sworn trial jurors to six. *Id.* at 27–28.

The next day, December 3, 1985,[12] jury selection resumed. Another panel was placed in the jury box (the "Third Panel") and examined by the court, the government, and Grate's counsel. *Id.* at 37. The government challenged one prospective juror for cause; Grate's attorney challenged two. *Id.* at 40. The government then exercised a total of six peremptory chal-

---

11. According to the transcript, each party was entitled to twenty peremptory challenges. *Id.* at 21.

12. The cover sheet of the transcript erroneously refers to this day, too, as December 2, 1985. The minutes make clear, however, that this day was in fact December 3, 1985. *See id.* at 28.

lenges, while Grate's attorney exercised a total of five. *Id.* at 40–41. Grate's attorney then stated, "I want the record to note my continuing objection to the use of peremptory challenges to exclude members of the black race. And I would ask the Court to elicit or request of [the district attorney] the reason for his continuing to do that." *Id.* at 41. The court responded by saying that "[the district attorney] isn't saying a word," *id.*, and that "[t]here were many more black faces this time than there were the last, many more, and there are still some out in the back of the courtroom. Systematic exclusion?," *id.* at 42. Grate's attorney responded to this by saying

> I think when you say there are many black faces, that is not accurate, in the sense that every single black person that has come up on this panel, and the two prior panels, the two prior mistrials, that has not asked to be excused, every single one [the government] has exercised a peremptory on. He has not left one on.... If you want to count them, we will count them.

*Id.* at 43. The district attorney responded to Grate's attorney's argument by stating that "there were several blacks who asked to be excused, who I was perfectly satisfied with." *Id.* The court then stated that "this ends the argument." *Id.* The two remaining prospective jurors in the Third Panel were impaneled and sworn as trial jurors. *Id.*

Another panel (the "Fourth Panel") was called into the jury box and subjected to the same process. After voir dire, four prospective jurors were excused and replaced with four other jurors. *Id.* at 46.[13] The government exercised no challenges for cause, *id.* at 47; Grate's attorney exer-

cised two, *id.* at 47, 49. The government made a total of five peremptory challenges, *id.* at 50–51; Grate's attorney also made five, *id.* This left four prospective jurors to be impaneled, which completed the jury at twelve, *id.* at 51. After the selection of the jury was complete (but before alternates were selected), a long sidebar conference ensued, which ended with the following colloquy:

> [GRATE'S ATTORNEY]: ... I just want to put on the record my continuing objection to the District Attorney's exercising peremptory challenges as to the remaining three black members of the panel, the entire panel ....
>
> I listened to all their answers and there was not one that indicated any prejudice or any problem with being fair in this case.
>
> Again, this has been incessantly done throughout the case. They have been excused peremptorily by [the government]. The only apparent reason for that is the fact that they are black and the Defendant is black. And I object to that.
>
> And I would ask the Court to conduct some inquiry—
>
> [DISTRICT ATTORNEY]: That's not my reason.
>
> THE COURT: I'm listening. Go ahead.
>
> [DISTRICT ATTORNEY]: I'm finished.
>
> THE COURT: Go ahead.
>
> [DISTRICT ATTORNEY]: I'm finished.. I said that was not my reason.
>
> THE COURT: Are you waiting for something?
>
> [GRATE'S ATTORNEY]: No.

---

**13.** This transcript has two pages in a row numbered "46." This reference can be found on the first of those two pages.

*Id.* at 56–57. At this point, the parties attempted to pick alternate jurors, but were unsuccessful, and so the court recessed until the next day, December 4, 1985. *Id.* at 58, 60. Neither party has produced the transcript of the selection of alternate jurors the following day, and neither party alleges that additional *Batson* issues arose during the selection of the alternates. The next available transcript comes from December 5, 1985, the first day of Grate's trial. The voir dire transcript does not reveal whether any black jurors ended up on the jury, either as trial jurors or as alternates. The government, in its opposition to Grate's second motion for writ of error *coram nobis,* however, explicitly stated that "there were no African–American jurors and the prosecutor peremptorily challenged four African–American venirepersons." Resp't's Opp'n Ex. 8 (Affidavit and Memorandum in Opposition to Writ of Error *Coram Nobis* ), Memorandum at 7. Neither party submitted data regarding how many black men and women were in the original venire.

Several features of the jury selection process in this case are striking. First, Grate's attorney objected clearly and repeatedly to what he believed was the government's deliberate use of peremptory challenges to exclude prospective black jurors from the jury. Voir Dire Tr. at 26–27 (Second Panel), 41, 43 (Third Panel), 56–57 (Fourth Panel). Second, Grate's attorney asked the court to inquire into the district attorney's reasons for exercising peremptory challenges against prospective black jurors, after the district attorney had challenged a number of blacks. *Id.* at 41, 57.[14] Third, the trial court never responded to Grate's attorney's claim of discrimination in juror selection, except to say that

"[t]here were many more black faces this time than there were the last, many more, and there are still some out in the back of the courtroom," *id.* at 42, a point which Grate's counsel countered by observing that the district attorney had exercised peremptory challenges against every black prospective juror in each panel who did not ask to be excused, *id.* at 43. Fourth, at no point did the court ask the government to respond to Grate's attorney's allegation of discrimination, and at one point even noted that the district attorney "isn't saying a word," *id.* at 41.

Finally, the court, in its only response to Grate's attorney's objection, asked the question, "Systematic exclusion?," *id.* at 42. This question is significant, because it illumines the court's view of the objection raised by Grate's attorney in light of the then-extant Supreme Court case law. At the time of Grate's trial, the case governing discrimination in peremptory challenges was *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which held that although the exercise of peremptory challenges on the basis of race violated the Equal Protection Clause, proof of such invidious discrimination could not be established on the basis of the prosecutor's exercise of peremptory challenges in a single case. *Id.* at 221–22, 85 S.Ct. 824. Under *Swain,* a "systematic practice" of exercising peremptory challenges on the basis of race across multiple cases was required to make out an equal protection violation. *Id.* at 223–24, 85 S.Ct. 824. The trial court, operating under the rule laid down by the Supreme Court in *Swain,* was not required to inquire into the reasons for the district attorney's exercise of peremptory challenges against black persons in a

---

14. This undermines the government's contention in its opposition to Grate's second motion for writ of error *coram nobis* that Grate's trial counsel "never requested below that the prosecutor provide race-neutral reasons" for the peremptory challenges. Resp't's Opp'n Ex. 8, Memorandum at 7.

single case. *See id.* at 222, 85 S.Ct. 824 ("[W]e cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case.").

*Batson,* decided after Grate was tried and convicted, but before he completed his direct appeal through the New York state courts, changed the above landscape in several significant respects. First, it repudiated the principle articulated in *Swain* that a defendant could not make out an equal protection violation on the basis of a prosecutor's conduct in a single case. *Id.* at 95–96, 106 S.Ct. 1712. Second, it established a framework whereby a defendant could make out a *prima facie* case of discrimination in the government's exercise of peremptory challenges—for example, by showing "a 'pattern' of strikes against black jurors included in the particular venire." *Id.* at 97, 106 S.Ct. 1712. Third, it ruled that, once a defendant makes such a showing, the government is obliged to articulate a legitimate, non-discriminatory reason for making the strike, even if the reason need not rise to a level justifying a strike for cause. *Id.* Finally, it required courts to make an ultimate determination, after the burden has shifted to the government to explain its peremptory strikes, as to whether the government did in fact engage in impermissible discrimination. *Id.* at 98, 106 S.Ct. 1712.

Moreover, although *Batson* did not say in so many words that violations of its mandate could never be harmless, it did state that if a *prima facie* case of discrimination is established and not countered by a race-neutral justification by the government, "our precedents require that petitioner's conviction be reversed." 476 U.S. at 100, 106 S.Ct. 1712. Around the same time, the Supreme Court concluded that discrimination on the basis of race in the selection of the grand jury constituted structural error mandating automatic reversal of a conviction. *Vasquez v. Hillery,* 474 U.S. 254, 263–64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (plurality opinion) ("[D]iscrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review."); *id.* at 266, 106 S.Ct. 617 (O'Connor, J., concurring) ("This Court has long held that upon proof of systematic exclusion of blacks from a grand jury issuing an indictment, the admittedly costly remedy of reversal of a conviction thereafter obtained through a fair trial is necessary in order to eradicate and deter such discrimination."). In light of these pronouncements from the Supreme Court, by the time *Batson* was decided it would have been reasonable for an appellate attorney to assume that a violation of *Batson* amounted to a structural error requiring automatic reversal of a conviction. *See, e.g., Tankleff v. Senkowski,* 135 F.3d 235, 248 (2d Cir.1998) (looking to *Batson* and other Supreme Court cases in concluding that *Batson* error is structural error that is not subject to harmless error review).

In *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Supreme Court held that defendants who were tried before the rule in *Batson* was announced could nonetheless avail themselves of the benefit of the rule so long as they were still prosecuting their cases on direct appeal at the time *Batson* was decided. *Id.* at 316, 107 S.Ct. 708. *Griffith* was decided on January 13, 1987, almost a full year before Grate's appellate counsel submitted his brief to the Second Department in November 1988, Resp't's Opp'n Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department), at 44, almost two years before the Second Department affirmed Grate's conviction on November 13, 1998, 155 A.D.2d at 553, 547 N.Y.S.2d 584, and over three years before

the Second Department denied Grate leave to appeal to the Court of Appeals on March 19, 1990, Resp't's Opp'n Ex. 5, at which point his conviction became final under *Griffith*.

By the time Grate's appellate counsel filed his brief with the Second Department, then, several critical legal developments had become apparent.[15] First, Grate could make out a claim of racial discrimination in the selection of a petit jury on the basis of the government's exercise of peremptory challenges in his case alone. Second, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. Third, once such an inference was established by the defendant, the government would be required to come forward with race-neutral reasons for exercising the strikes. *Id.* Fourth, failure by the government to do so after the defendant established a *prima facie* case of discrimination would likely warrant automatic reversal of the conviction. *Id.* at 100, 106 S.Ct. 1712. Finally, although these rules were not applied at Grate's trial, as they were not yet "the rules," Grate could nonetheless take advantage of them in arguing for reversal of his convic-

tion on direct appeal. *Griffith*, 479 U.S. at 316, 107 S.Ct. 708.

This Court need not decide definitively whether, had Grate's appellate counsel made this argument on direct appeal, Grate's conviction would have been reversed. At this juncture, the Court need only ask whether, in light of these legal developments, appellate counsel's failure to raise this argument amounted to ineffective assistance of counsel. In answering this question, the Court is guided by the Second Circuit's decision in *Mayo* that "a petitioner may establish constitutionally inadequate performance [of appellate counsel] if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." 13 F.3d at 533.[16]

In this Court's view, Grate's appellate counsel's failure to raise the *Batson* issue was an omission of a very strong argument that could have led to automatic reversal of Grate's conviction. Grate's trial counsel vociferously objected to the district attorney's exercise of peremptory challenges against black prospective jurors, and demanded that the district attorney explain why he was striking the would-be jurors. Because the trial court was operating within the then-appropriate framework—that

---

**15.** The Court focuses on the legal regime that was in place at the time Grate's appellate counsel filed his brief on Grate's behalf, because in assessing the effectiveness of counsel, it is important to consider only the legal rules that were extant at the time counsel took the action (or inaction) alleged to be constitutionally deficient. *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994).

**16.** To be sure, *Mayo* is not a Supreme Court case, and Supreme Court cases are what matter in determining whether a state court unreasonably applied "clearly established federal law," 28 U.S.C. § 2254(d)(1), as this Court must do with respect to the decision of the

Second Department rejecting Grate's *coram nobis* petition. But as the Supreme Court suggested in *Williams v. Taylor*, with respect to claims of ineffective assistance of counsel, it matters only that the framework laid down in *Strickland* is "clearly established," not that a particular analysis of what constitutes ineffective assistance is "clearly established." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495; *accord Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir.2001) ("[F]or AEDPA purposes, it matters only that the *Strickland* performance and prejudice test has been 'clearly established'—not that a particular theory of ineffective assistance has been clearly established.").

was later overruled by *Batson*—it declined to rule on whether Grate's trial counsel had raised an inference of discrimination, and refused, to inquire of the government as to its justification for the peremptory strikes. The trial court was content that no systematic exclusion was taking place across cases, and therefore inquired no further into the allegations. The result was that four black jurors made it to voir dire in the jury box, but all four were excluded by the government, leaving a jury with no black members. This alone may have established a *prima facie* case that required the government to come forward with a neutral justification for the strikes. *E.g., Tankleff,* 135 F.3d 235, 249 ("[T]he fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case.").

By the time Grate's appellate counsel submitted his brief to the Second Department, *Batson* claims were being made in the New York state appellate courts with great frequency and success. In *People v. Scott,* 70 N.Y.2d 420, 522 N.Y.S.2d 94, 516 N.E.2d 1208 (Nov. 19, 1987), for example, the New York Court of Appeals reversed the conviction of a black defendant and remanded the case for a new trial upon finding that the prosecutor had peremptorily challenged all five black members of the venire, despite the fact that "any bias they might have would favor the prosecution." *Id.* at 425, 522 N.Y.S.2d 94, 516 N.E.2d 1208.[17] Although the Court of Appeals contemplated a remand in order to hold a hearing to determine why the government exercised the challenges it did (because the government had never been asked to proffer a race-neutral explanation for the strikes, as the trial took place before *Batson* was decided), but ultimately concluded that, because no transcript of jury selection had been made, over four years had elapsed since the trial, and the presiding judge no longer sat in that court, reversal of the conviction was the only appropriate remedy. *Id.* at 426, 522 N.Y.S.2d 94, 516 N.E.2d 1208. In another case, *People v. Mack,* 143 A.D.2d 280, 532 N.Y.S.2d 161 (2d Dep't Aug.29, 1988), the Second Department reversed the defendant's conviction "without regard to the quantum or quality of proof of guilt" upon finding that *Batson* error had taken place, where "all four prospective black jurors were peremptorily challenged by the People," and where the prosecutor's statement that the challenges had nothing to do with race was legally insufficient to rebut an inference of discrimination. *Id.* at 281, 532 N.Y.S.2d 161. These are but two examples of *Batson* claims made in the appellate courts of New York at the time of Grate's appeal. *See also, e.g., People v. Walker,* 142 A.D.2d 972, 531 N.Y.S.2d 74 (4th Dep't July 7, 1988) (remanding for hearing on reasons for government's exercise of peremptory strikes against three black venirepersons); *People v. Mims,* 140 A.D.2d 929, 529 N.Y.S.2d 610 (4th Dep't May 27, 1988) (remanding for hearings on reasons for government's exercise of peremptory strikes against two black venirepersons);

---

**17.** One of the black jurors challenged by the prosecution in *Scott* bore a characteristic identical to a black prospective juror challenged by the prosecutor (albeit for cause) in Grate's case. The black juror in *Scott* was challenged by the prosecutor because her brother-in-law was "killed as the result of an assault" in a case involving murder and robbery. *Id.* at 424, 522 N.Y.S.2d 94, 516 N.E.2d 1208. Defense counsel argued that "any bias she might have would favor the victims of violent crime, and thus the prosecution." *Id.* Similarly, in Grate's case the district attorney challenged a black woman for cause because her sister was murdered, Voir Dire Tr. at 25, a fact which, if it made the juror biased, would presumably make her biased in favor of the government.

*People v. Hernandez,* 140 A.D.2d 543, 528 N.Y.S.2d 625 (2d Dep't May 16, 1988) (concluding that defendant made out *prima facie Batson* claim, but that prosecutor offered adequate race-neutral justifications for his peremptory challenges to rebut inference of discrimination); *People v. Bridget,* 139 A.D.2d 587, 527 N.Y.S.2d 81 (2d Dep't Apr.11, 1988) (same); *People v. Johnson,* 138 A.D.2d 952, 526 N.Y.S.2d 688 (4th Dep't Mar.4, 1988) (ruling that prosecutor provided adequate race-neutral explanation for challenges); *People v. Lawson,* 136 A.D.2d 929, 524 N.Y.S.2d 910 (4th Dep't Jan.29, 1988) (remanding for explanation of prosecutor's challenges); *People v. ZZ,* 134 A.D.2d 814, 816, 521 N.Y.S.2d 873 (3d Dep't Nov.25, 1987) (holding that prosecutor provided adequate race-neutral explanation for challenges); *People v. Alston,* 134 A.D.2d 433, 435, 521 N.Y.S.2d 56 (2d Dep't Nov.16, 1987) (rejecting *Batson* claim); *People v. Hockett,* 128 A.D.2d 393, 393–94, 512 N.Y.S.2d 679 (1st Dep't Mar.5, 1987) (affirming trial court's ruling—made on remand for evidentiary hearing—that prosecutor had not rebutted defendant's *prima facie* case of discrimination, and thus vacating conviction and remanding for new trial).

Compared to Grate's *Batson* claim, the arguments that Grate's appellate lawyer actually made in his brief appear particularly weak. Grate's lawyer made three arguments on appeal: (1) Grate's confession was involuntary; (2) Grate's right of confrontation was violated when Clink's statement was admitted at a joint trial of Grate and Clink; (3) Grate's right to a fair trial was violated when a portion of the testimony of Thomas Darnowski, *see supra* p. 15, relating to Grate's IQ and academic abilities was excluded. *See* Resp't's Opp'n Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department). As this Court has already discussed, however, Grate's voluntariness argument was a non-

starter in light of the absence of any indication from the record that the police used coercive tactics to elicit a confession. *See supra* Part II.A. Grate's Confrontation Clause argument was also doomed to failure, particularly as Grate's appellate lawyer presented it. *See* Resp't's Opp'n Ex. 1 (Brief of Grate's attorney on direct appeal to the Second Department), at 28–29, 32; *Grate,* 155 A.D.2d at 554, 547 N.Y.S.2d 584. The final claim raised by Grate's counsel was patently without merit. Darnowski was in fact allowed to testify to what Grate's trial counsel sought to establish, i.e., that Grate's IQ and academic functioning were so low that he would have been unable to write his confession on his own, Trial Tr. at 731–32, 764. This testimony informed only the question whether Grate's confession was voluntary; both the court and the jury concluded that it was.

In light of the foregoing discussion, the Court concludes that the conduct of Grate's appellate counsel fell below the standard of competence outlined in *Strickland.*

The next question is whether Grate suffered prejudice as a result of his counsel's ineffectiveness. Had Grate's appellate lawyer raised the *Batson* issue on appeal, it seems clear that Grate would at least have been entitled to remand for a hearing to explore the government's justifications for its race-based peremptory challenges, as the trial court, applying *Swain,* never required the government to explain its reasons for the challenges to black prospective jurors. Grate may even have been entitled to a new trial in light of the Second Department's earlier ruling in *Mack* that *Batson* error required reversal without regard to the quality and quantity of evidence of guilt, *Mack,* 143 A.D.2d at 281, 532 N.Y.S.2d 161, or in light of the fact that almost four years had elapsed from the time of Grate's trial until the time

Grate's appeal was decided, *see Scott,* 70 N.Y.2d at 426, 522 N.Y.S.2d 94, 516 N.E.2d 1208.

It is, of course, possible that remand for a hearing would have been the order of the Second Department, and that at the hearing the government would have proffered acceptable race-neutral reasons for the challenges, as the bar at this step of the *Batson* inquiry is not a high one. *See Batson,* 476 U.S. at 79, 106 S.Ct. 1712 ("[W]e emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."). But it is pure speculation to surmise what might have happened at such a hearing on remand. The Court notes, however, that the New York Court of Appeals rejected a prosecutor's race-neutral explanation identical to one offered by the prosecutor in Grate's case: that a black prospective juror, who had a relative who had been murdered, could not be free from bias against the government's case. *Scott,* 70 N.Y.2d at 424, 522 N.Y.S.2d 94, 516 N.E.2d 1208; *see also supra* note 12.

For purposes of Grate's ineffective assistance of counsel claim, it suffices for Grate to show that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The Court concludes that the outcome of Grate's direct appeal to the Second Department—a summary affirmance of the judgment of conviction—would likely have been different had Grate's appellate lawyer raised the *Batson* issue. Whether that different outcome would have been a new trial or a remand for a hearing to explore the government's reasons for its peremptory challenges does not alter this Court's conclusion that Grate suffered prejudice from his appellate lawyer's failure to argue *Batson* error before the Second Department.

This Court has concluded that Grate's appellate lawyer was constitutionally ineffective in failing to raise the *Batson* issue, and that Grate suffered prejudice as a result of this failure. The last piece of the puzzle poses this question: Did the Second Department, in denying Grate's second petition for writ of error *coram nobis,* unreasonably apply the Supreme Court's decision in *Strickland?* Only if the answer to this question is yes may this Court disturb the judgment of that court. 28 U.S.C. § 2254(d)(1).

By the time of Grate's direct appeal, the appellate courts of New York had collectively decided that, once *Batson* error is established, the very minimum that is required is a remand to the trial court to explore the government's reasons for its race-based exercise of peremptory challenges. The Second Department had intimated that *Batson* error is *per se* reversible error, not subject to harmless error analysis. *Mack,* 143 A.D.2d at 281, 532 N.Y.S.2d 161. The New York Court of Appeals had ruled that, if a reliable determination could not be made regarding the reasons for the government's race-based exercise of peremptory challenges (because of, for example, the lapse of time or the absence of a voir dire transcript), the only solution was to vacate the conviction and remand for new trial. *Scott,* 70 N.Y.2d at 426, 522 N.Y.S.2d 94, 516 N.E.2d 1208. These same cases had concluded, on facts substantially similar to those presented in Grate's case, that the defendant had established a *prima facie* case of discrimination. *Scott,* 70 N.Y.2d at 425, 522 N.Y.S.2d 94, 516 N.E.2d 1208; *Mack,* 143 A.D.2d at 281, 532 N.Y.S.2d 161.

These state court cases demonstrate that, at the time of Grate's appeal, the one response by New York appellate courts to identified *Batson* error that was *not* acceptable was summary affirmance of the

judgment of conviction at trial. Grate had a winnable *Batson* claim on his hands, thanks to the efforts of his trial counsel to preserve his objection and the fact that the trial court did not comply with *Batson* because it was not yet the law at the time of Grate's trial. Once it became clear that Grate could take advantage of the rule announced in *Batson* on direct appeal, therefore, it became constitutional error for Grate's appellate lawyer to decline to advance that claim, particularly in light of the arguments that were ultimately made by that attorney, which were without merit and which would have been subject to harmless error analysis even had they been meritorious. In light of this constellation of factors that was clear at the time Grate's appellate counsel prosecuted the direct appeal, it was not only erroneous for the Second Department to reject Grate's claim of ineffective assistance, it was unreasonable. *See Francis S. v. Stone*, 221 F.3d at 111 ("Some increment of incorrectness beyond error is required [under section 2254(d)(1) ]. We caution, however, that the increment need not be great.").

## III. CONCLUSION

All of Grate's claims save one are without merit. The one claim that is meritorious, however, compels this Court to conclude that the Second Department's resolution of that claim in rejecting Grate's motion for writ of error *coram nobis* represented an unreasonable application of clearly established federal law, specifically the Supreme Court's decision in *Strickland v. Washington*. The decision of the Second Department, therefore, violates 28 U.S.C. § 2254(d)(1).

Accordingly, the Court GRANTS Grate's petition for writ of habeas corpus [Docket No. 1], unless the government within 90 days of this order either allows him an opportunity to present an appeal to the appropriate state court as if the *Batson* issue had been properly presented, or provides Grate with a new trial. *See Mayo*, 13 F.3d at 537 (approving of this form of relief after ruling that petitioner's claim of ineffective assistance of appellate counsel entitled him to relief).